| HARRIS, ST. LAURENT & CHAUDHRY LLP | DYKEMA GOSSETT PLLC |
|---|---|
| Andrew St. Laurent | Rosa M. Tumialán (*pro hac vice to be filed*) |
| Evan W. Bolla | Michael F. Derksen (*pro hac vice to be filed*) |
| Megan Dubatowka | 10 S. Wacker Dr., Ste. 2300 |
| 40 Wall Street | Chicago, IL 60606 |
| 53rd Floor | Tel.: (312) 876-1700 |
| New York, NY 10005 | Fax: (312) 876-1155 |
| Tel.: (646) 248-6010 | rtumialan@dykema.com |
| Fax: (212) 202-6206 | mderksen@dykema.com |
| andrew@sc-harris.com | |
| ewbolla@sc-harris.com | |
| mdubatowka@sc-harris.com | |

*Attorneys for Plaintiff JUAN ÁNGEL NAPOUT*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN ÁNGEL NAPOUT,<br><br>                      Plaintiff,<br>v.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S LONDON; AXIS SPECIALTY EUROPE SE,<br><br>                      Defendants. | **Civ. Action No. _____** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION REQUIRING <u>DEFENDANTS TO TIMELY PAY LEGAL COSTS</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 4

STATEMENT OF FACTS ...................................................................................................... 7

    A.    The Insurance Policy........................................................................................... 7

    B.    Mr. Napout's Request for, and the Underwriters' Agreement to Provide, Coverage Under the Policy ................................................................................................ 8

    C.    The Underwriters' Failure to Satisfy Their Obligations to Mr. Napout Pursuant to the Policy ................................................................................................................. 10

ARGUMENT ........................................................................................................................ 13

**MR. NAPOUT IS ENTITLED TO IMMEDIATE INJUNCTIVE RELIEF** ......................... 13

    A.    Mr. Napout Will Suffer Irreparable Harm if the Injunction is Not Granted. ............ 14

    B.    Mr. Napout is Likely to Prevail on the Merits. ............................................. 16

    C.    The Balance of Equities Decidedly Favors the Issuance of Injunctive Relief. ............. 17

    D.    This Court Should Not Require Mr. Napout to Post a Bond ........................................ 18

CONCLUSION ..................................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*,
  696 F.3d 206 (2d Cir. 2012) .................................................................................... 13, 17

*Fed. Ins. Co. v. Kozlowski*,
  792 N.Y.S.2d 397 (N.Y. App. Div. 2005) ...................................................................... 17

*In re WorldCom Inc. Securities Litig.*,
  354 F. Supp. 2d 455 (S.D.N.Y. 2005) ............................................................ 13, 14, 15, 18

*Johnson v. Kay*,
  860 F.2d 529 (2d Cir. 1988) .......................................................................................... 13

*Kamerling v. Massanari*,
  295 F.3d 206 (2d Cir. 2002) .......................................................................................... 16

*Li v. Certain Underwriters at Lloyd's*,
  183 F. Supp. 3d 348 (E.D.N.Y 2016) ........................................................................ passim

*Oneida Grp. Inc. v. Steelite Int'l, USA, Inc.*,
  No. 17-0957 (ADS) (AKT), 2017 U.S. Dist. LEXIS 37278 (E.D.N.Y. Mar. 14, 2017) .......... 13

*Rocha v. Certain Underwriters at Lloyd's London*,
  No. 16 CV 2327 (RJD) (CLP), 2016 U.S. Dist. LEXIS 188176 (E.D.N.Y. Sept. 26, 2016)
  ................................................................................................................................ passim

*UBS Fin. Servs., Inc. v. W. Va. Hosps., Inc.*,
  660 F.3d 643 (2d Cir. 2010) .................................................................................... 13, 17

*XL Specialty Ins. Co. v. Level Global Investors, L.P.*,
  874 F. Supp. 2d 263 (S.D.N.Y. 2012) ............................................................ 14, 15, 16, 18

## STATUTES

Fed. R. Civ. P. 65 ............................................................................................................ 4

Plaintiff Juan Ángel Napout ("Mr. Napout") submits this memorandum of law in support of his motion, under Fed. R. Civ. P. 65, for emergency injunctive relief requiring Defendants, Certain Underwriters at Lloyd's London, and AXIS Specialty Europe SE (collectively, the "Underwriters") to immediately pay the costs Mr. Napout has incurred and continues to incur in connection with his defense in *United States v. Webb*, No. 15-cr-252 ("the "FIFA Proceedings")—a criminal case in which Mr. Napout is set to stand trial beginning on *November 6, 2017* (the "Underlying Action").[1]

## PRELIMINARY STATEMENT

The issues raised by Mr. Napout's motion for a temporary restraining order and a preliminary injunction (the "Motion") are certainly not new to this District. Indeed, this District have ***already ruled twice***—in cases concerning the same Underlying Action, the same insurance policy, the same material facts, and similarly-situated insureds—that the insureds are entitled to payment of their legal costs "at the time they are incurred and on an ongoing basis." *Li v. Certain Underwriters at Lloyd's*, 183 F. Supp. 3d 348, 362 (E.D.N.Y 2016) ("*Li*"); *see also Rocha v. Certain Underwriters at Lloyd's London*, No. 16 CV 2327 (RJD) (CLP), 2016 U.S. Dist. LEXIS 188176 (E.D.N.Y. Sept. 26, 2016) ("*Rocha*"). Simply put, based on the reasoning in *Li* and *Rocha* alone, Mr. Napout's Motion should be granted. Given those rulings, no reasonable insurer would deny policy benefits to its insured as the Underwriters have denied benefits to Mr. Napout.

---

[1] The Underlying Action as defined herein includes an indictment (and all relevant superseding indictments) issued by the Grand Jury for the Eastern District of New York (collectively, the "Indictments"), a related request by the United States Government to the Swiss authorities to extradite Mr. Napout to the United States to face the charges alleged against him in the FIFA Proceedings ("Request for Extradition"), and a Victim Statement and Request for Restitution filed by the Fédération Internationale de Football Association ("FIFA") in connection with the Indictment ("FIFA Complaint").

The Underwriters' refusal to honor their obligations to Mr. Napout are arguably even more egregious than they were in *Li* or *Rocha*. The only substantive differences between this case and *Li* and *Rocha* is that here, (a) the Underwriters **already acknowledged**—many months ago, in fact—that Mr. Napout qualifies as an "Insured Person" as defined by the relevant insurance policy and that the Underwriters are required to pay his defense costs (subject to a reservation of rights); and (b) the Underwriters nevertheless continue to *de facto* deny him coverage by unreasonably delaying payment of his mounting defense costs despite that Mr. Napout's trial in the FIFA Proceedings—a complex criminal prosecution against individuals associated with FIFA, its member associations, and sports marketing companies—is set to begin in ***less than a week***. The Underwriters, after acknowledging their obligations under the relevant policy—which have been memorialized in two recent rulings from this District—are compromising Mr. Napout's ability to present a zealous criminal defense so that the Underwriters can minimize the amount of defense costs paid on his behalf. Mr. Napout reasonably believes that the delay is purposeful—the less the Underwriters pay now, the less they will seek to claw back under the Policy *if* Mr. Napout is found guilty. Moreover, by compromising Mr. Napout's ability to put on his defense, Underwriters may well increase the likelihood that they will be entitled to that claw back.

The Underwriters have engaged in this purposeful delay, paying only a minimal amount, despite the observation by Judge Raymond J. Dearie in *Li*, where he explicitly stated that it is "clear that the Insurers have an obligation to pay Li's legal costs ***at the time they are incurred and on an ongoing basis***." *Li*, 183 F. Supp. 3d at 362 (emphasis added).[2] Mr. Napout is owed

---

[2] Since "accepting" Mr. Napout's defense subject to a reservation of rights in March 2017, the Underwriters paid only $2.25 million (in two separate payments) toward the past defense fees. The Underwriters have paid ***none*** of the defense fees incurred since March 2017.

this same benefit based on the same material facts and legal principles and yet, the Underwriters refused to honor their indisputable obligations, paying just a subset of Mr. Napout's past legal costs and failing to pay Mr. Napout's legal costs "at the time they are incurred and on an ongoing basis." Such conduct not only constitutes a breach of the policy, but also a breach of the covenant of good faith and fair dealing implied therein. Mr. Napout is entitled not only to the policy benefits denied him to date, but also any and all consequential damages including but not limited to the legal fees and expenses he was forced to incur in bringing this coverage action.

To be sure, as Mr. Napout's trial date, which is now scheduled for November 6, 2017, rapidly approaches, he faces mounting defense costs totaling in the millions of dollars and has been denied the protection afforded to him under the ***exact same policy*** at issue in *Li* and *Rocha*.[3] Any further delay will only exacerbate the harm already suffered by Mr. Napout, who has for all intents and purposes funded his own defense despite two court rulings finding he is entitled to a funded defense under the Policy.

The courts in *Li* and *Rocha* both held that the Underwriters' refusal to promptly pay legal defense costs—which are necessary for an insured to defend against pending criminal charges like those faced by Mr. Napout—required the issuance of injunctive relief. *Li*, 183 F. Supp. 3d at 362; *Rocha*, 2016 U.S. Dist. LEXIS 188176, at *8-9. Here, because the Underwriters already agreed that they owe a defense to Mr. Napout and because his trial is quickly approaching, there can be no question that Mr. Napout is entitled to immediate injunctive relief as well.

---

[3] The most recent defense fee bill from September transmitted to the Underwriters on October 5, 2017, totals in excess of $500,000.

6

**STATEMENT OF FACTS**

A.  **The Insurance Policy**

The Underwriters sold a Directors and Officers Legal Liability Policy, No. L1413318, to FIFA, effective December 30, 2014 to December 30, 2015, which is subject to a $50,000,000 limit of liability for each and every loss and in the annual aggregate, including costs and expenses (the "Policy"). *See* Declaration or Rosa Tumialán (the "Tumialán Decl."), Ex. A, at Schedule, §§ 1,1, 1.3. The Policy provides "world-wide" coverage to "Insured Persons," including FIFA's present, former, and future officers, directors, general agents, and representatives, with respect to claims that they committed a wrongful act in such capacities. *Id,* at §§1.1, 1.3, 1.10, 2.4. The Underwriters charged at least $270,437 in premiums as consideration for the Policy. *Id.* at Schedule.

The Policy provides, in relevant part:

> Insurance cover will be provided world-wide by the insurer for all sums for which any Insured Persons are held liable on the basis of legal liability provisions for financial losses arising out of wrongful acts, whether actual *or alleged*,[] committed in their capacity pursuant to item 1.3 [Insured Persons] …
>
> \* \* \*
>
> Insurance cover *shall* **also include defence costs incurred to defend any actual *or alleged* wrongful acts and also Investigation costs,** being the reasonable fees, costs and expenses incurred by or on behalf of an Insured Person with the Underwriters' prior written consent for the principal purpose of preparing for and attending an investigation as detailed below ...
>
> \* \* \*
>
> Investigation shall mean any formal hearing, examination, investigation or inquiry by an official body into the affairs of a company or outside entity, or an Insured Person of such entity, once an Insured Person:
>
> • is required to attend;

7

> - is identified in writing by an investigating official body as a target of the hearing, examination or inquiry; or
>
> An investigation shall be deemed to be first made when the Insured Person is first so required, identified or served.

*Id.* at § 1.1 (emphasis added). In addition, the Policy provides coverage for the "reasonable legal fees, costs and expenses" incurred in connection with extradition proceedings. *Id.* at § 1.10.

Finally, the Policy specifically provides for defense costs in connection with criminal proceedings (such as the FIFA Proceedings):

> If, due to a breach of duty in accordance with clause 1 (subject-matter of insurance) investigative proceedings are initiated in accordance with the provisions of the criminal law, or the law concerning the infringement of regulations, or of disciplinary law or codes of professional conduct, the insurer will pay for the costs of the defense of these proceedings.

*Id.* at § 2.4.[4]

### B. Mr. Napout's Request for, and the Underwriters' Agreement to Provide, Coverage Under the Policy

On May 19, 2016, Mr. Napout requested reimbursement from the Underwriters and advancement of legal costs in connection with the Underlying Action. *See* Tumialán Decl., ¶ 2. The Underwriters issued a reservation of rights letter on June 10, 2016, requested that Mr. Napout provide certain information, but did not assume his defense at that time. *Id.* at ¶ 3. On August 4, 2016, Mr. Napout responded to the Underwriters' June 10, 2016 letter and provided the requested information, which should have prompted acceptance of his tender. *Id.* at ¶ 4. The Underwriters failed to respond to Mr. Napout's August 4, 2016 correspondence, and Mr. Napout was required to resubmit his August 2016 materials to them in November 2016. *Id.* at ¶ 5.

---

[4] The Policy also provides: "Where a final and conclusive declaration of a wrongful intent is made by court, and all appeals against such declaration have been exhausted… the Insured Person found guilty will be obliged to reimburse the Insurer for all payments made on his or her behalf." *Id.* at § 3.1.

On December 16, 2016, the Underwriters originally denied coverage. *See* Tumialán Decl., ¶ 6. As a result of the Underwriters' (initial) wrongful denial of coverage, in early 2017, Mr. Napout was prepared to file a complaint in this District to recover his legal costs under the very same policy language construed in favor of the insureds in *Li* and *Rocha*. Mr. Napout's coverage counsel also informed counsel for the Underwriters that the Complaint would seek consequential damages resulting from the Underwriters' failure to honor their duty of good faith and fair dealing. *Id.* After requesting, on several occasions, that Mr. Napout delay filing his complaint, on or around March 7, 2017, counsel for the Underwriters informed Mr. Napout's coverage counsel that the Underwriters agreed to reimburse Mr. Napout's legal defense costs (which, at that time, totaled over $6 million), and to fund Mr. Napout's defense going forward, subject to a forthcoming reservation of rights letter. *Id.* at ¶ 7. On or around May 5, 2017, the Underwriters' counsel advised that an interim payment of $1 million would be forthcoming. *Id.* at ¶ 8.

On May 9, 2017, the Underwriters finally provided their written reservation of rights (the "ROR Letter"), in which they expressly acknowledged that Mr. Napout qualified as an "Insured Person" under the Policy. *See* Tumialán Decl., ¶ 9. Specifically, the Underwriters' ROR Letter stated:

> In light of the allegations in the Indictment and Superseding Indictment, and further in light of the allegations contained within the FIFA Victim Statement, as well as the prior decisions of the District Court for the Eastern District of New York [in *Li* and *Rocha*] … Underwriters conclude that the Court will find Mr. Napout to be an Insured Person under the Policy.

*Id.* at Ex. D, p. 2.[5]

---

[5] The Underwriters further reserved their right to "reverse this determination in the event that facts become available which would justify such a reversal." *Id.*

9

Next, the Underwriters acknowledged that they "received invoices totaling $6,075,205.90 reflecting defense costs expended on behalf of Mr. Napout" as follows:

1. $545,190.60 from Esteban Burt Artaza;
2. $5,422,159.25 from Greenberg Traurig LLP ("Greenberg Traurig"); and
3. $107,856.05 from the Law Office of Silvia B. Pinera-Vazquez, P.A.[6]

*Id.* at p. 3. The Underwriters further acknowledged that this amount did not include the invoices forwarded by Mr. Napout's coverage counsel on May 8, 2017. *Id.* at p. 3 n.1. The ROR Letter requested certain additional information related to the defense costs, and concluded: "In order to move this process forward, and allow the Underwriters to begin processing payment on covered defense costs, we suggest a call to discuss these issues in order to resolve Underwriters' questions." *Id.* at pp. 3-4.

**C.  The Underwriters' Failure to Satisfy Their Obligations to Mr. Napout Pursuant to the Policy**

Mr. Napout's counsel promptly provided the Underwriters' counsel with the information requested by the end of May 2017. *See* Tumialán Decl., ¶ 10. Moreover, on May 30, 2017, counsel for the Underwriters, as well as Mr. Napout's coverage and defense counsel, convened a conference call. *Id.* at ¶ 11. Mr. Napout's counsel explained the status of the criminal proceedings, that discovery matters involved, *inter alia*, the production of documents in excess of twenty-nine (29) million documents, the pending November 6, 2017 trial date, and that Mr. Napout vehemently denied the allegations and intended to proceed to trial. *Id.*

On June 29, 2017, the Underwriters' counsel provided additional correspondence seeking information related to Mr. Napout's defense invoices from February to March 2017, which had already been provided to the Underwriters. *See* Tumialán Decl., ¶ 12. On July 11, 2017, the Underwriters' counsel were provided with an email addressing the final inquiries contained in

---

[6] The amount stated in Underwriters' Letter is incorrect.

the Underwriters' June 29, 2017 correspondence. *Id.* at 13. Counsel was also advised that an additional payment of $1.25 million would be forthcoming. *Id.*

As of August 11, 2017, the Underwriters had not responded to the July 11, 2017 email sent by Mr. Napout's coverage counsel, and did not advise that any additional documentation was required. *See* Tumialán Decl., ¶ 14. Having received neither a response nor the $1.25 million in past defense costs the Underwriters had promised to tender—and with Mr. Napout's trial ***less than three months away*** at the time—his coverage counsel had a telephone call with the Underwriters' counsel on August 11, explaining that the Underwriters' pattern of delay was continuing to compromise Mr. Napout's defense in his criminal trial, as his attorneys had been working without payment for several months. *Id.* at ¶ 14. On August 29, 2017, the Underwriters' counsel emailed Mr. Napout's coverage counsel stating that she was scheduled to speak with the Underwriters later in the week regarding status. *Id.* at ¶ 15. On September 8, 2017, Mr. Napout's coverage counsel was required to resend her July 11, 2017 email, because the Underwriters' counsel informed her, inexplicitly, that the Underwriters were still waiting on additional information to process some of the past defense costs. *Id.* at ¶ 16.

On September 12, 2017, Mr. Napout's coverage counsel sent an email to once again follow-up on the status of the Underwriters' long-promised payments. *See* Tumialán Decl., ¶ 17. The Underwriters' counsel responded by email on that same date asserting, for the first time, that the information provided by Mr. Napout's counsel ***two months prior*** did not resolve the outstanding documentation requested in the Underwriters' June 29 correspondence and stated, once again, that the Underwriters were still working to process payment. *Id.* Mr. Napout's coverage counsel responded by asking why this was the first time she was hearing this, what exactly the Underwriters now required, how did this belated request hold up the other payments,

11

and what the status was of the $1.25 million payment that was supposed to be provided two months prior. *Id.*

Nonetheless, on September 19, 2017, Mr. Napout's coverage counsel provided the requested additional backup documentation from one of Mr. Napout's defense firms, Greenberg Traurig, from June to July 2017, and once again demanded that the outstanding fees be paid immediately. *Id.* at ¶ 18.

On October 3, 2017, Mr. Napout's coverage counsel emailed counsel for the Underwriters, noted that her emails and voicemail have gone unanswered, and asked whether the Underwriters would pay the outstanding defense fees due, or if instead, they preferred that Mr. Napout initiate a "third case enforcing the same policy language." *See* Tumialán Decl., ¶ 19. The Underwriters' counsel responded that they "continue to review and approve further invoices in due course for payment." She once again stated that her clients "confirmed that they are working on the outstanding payment." *Id.* Mr. Napout's counsel responded on the same day and reminded the Underwriters' counsel that while the Underwriters had made two payments totaling $2.25 million, these payments came "only after months and months of constant requests for same and continued excuses for the delay." *Id.* On October 26, 2017, Mr. Napout's coverage counsel again inquired when the outstanding payment could be expected. *Id.* at ¶ 20.

To date, the Underwriters have reimbursed Mr. Napout for but a subset of his defense costs since they first agreed to provide a defense in March 2017, leaving well in excess of $5 million in legal defense costs outstanding. *See* Tumialán Decl., ¶ 21. The Underwriters refuse to honor their obligation to pay for Mr. Napout's legal defense costs "at the time they are incurred and on an ongoing basis," as required under the Policy as held in *Li,* 183 F. Supp. 3d 348. It is

clear that the assistance of this Court is required for Mr. Napout to procure what the Underwriters owe him under the Policy.

## ARGUMENT

## MR. NAPOUT IS ENTITLED TO IMMEDIATE INJUNCTIVE RELIEF

To obtain a temporary restraining order and/or a preliminary injunction, a party must show: (a) irreparable harm in the absence of the requested relief; and (b) either (1) a likelihood of success on the merits or (2) "sufficiently serious questions" that go to the merits of the case making them "a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Li*, 183 F. Supp. 3d at 360 (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (quoting *UBS Fin. Servs., Inc. v. W. Va. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2010)); *Rocha*, 2016 U.S. Dist. LEXIS 188176, at *8 (citations omitted). The standard for obtaining a temporary restraining order is the same as the standard for obtaining a preliminary injunction, and the purpose of a temporary restraining order is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. *Oneida Grp. Inc. v. Steelite Int'l, USA, Inc.*, No. 17-0957 (ADS) (AKT), 2017 U.S. Dist. LEXIS 37278, at *8 (E.D.N.Y. Mar. 14, 2017) (citations and quotations omitted).

At the outset, it is important to note that a heightened injunction standard does not apply here, because the requested injunction will simply require the Underwriters to do what they "should have done earlier…." *Li*, 183 F. Supp. 3d at 361 (quoting *Johnson v. Kay,* 860 F.2d 529, 541 (2d Cir. 1988)); *Rocha*, 2016 U.S. Dist. LEXIS 188176, at *8 n.4; *see also In re WorldCom Inc. Securities Litig.*, 354 F. Supp. 2d 455, 463 (S.D.N.Y. 2005) ("*WorldCom*") ("the policy language strongly supports [the insured's] argument that [the insurer] should already have been advancing defense costs, and the injunction will not substantially interfere with [the insurer's]

right to obtain a meaningful remedy if it prevails on the merits" since the insurer has the "right to recoup the defense costs."). As in *Li* and *Rocha*, Mr. Napout seeks a preliminary injunction so that the Underwriters are required to promptly advance the legal fees they should have already advanced under the terms of the Policy.

As set forth below, because Mr. Napout undoubtedly satisfies the above-referenced standard, he is entitled to injunctive relief requiring the Underwriters to *immediately* pay the past and ongoing legal costs incurred in connection with the Underlying Action.

A. **Mr. Napout Will Suffer Irreparable Harm if the Injunction is Not Granted.**

Just as in *Li* and *Rocha*, as a result of the Underwriters' refusal to timely advance Mr. Napout's legal costs as they have been incurred and before his trial, Mr. Napout "faces an actual and imminent injury and has established irreparable harm." *Li*, 183 F. Supp. 3d at 362; *Rocha*, 2016 U.S. Dist. LEXIS 188176, at *8 (holding that Mr. Rocha "has established both that he faces irreparable harm and that the balance of hardships [tips] decidedly in his favor"). As the *Li* court unequivocally explained, "'[t]he failure to receive defense costs under a professional liability policy at the time they are incurred constitutes an immediate and direct injury sufficient to satisfy the irreparable harm requirement and justifying a preliminary injunction.'" *Li*, 183 F. Supp. 3d at 361 (quoting *XL Specialty Ins. Co. v. Level Global Investors, L.P.*, 874 F. Supp. 2d 263, 272 (S.D.N.Y. 2012) ("*XL Specialty*") (citing *WorldCom*, 354 F. Supp. 2d at 469)); *see also Rocha*, 2016 U.S. Dist. LEXIS 188176, at *8-9.

Moreover, the decisions in *Li* and *Rocha* are well in line with precedent from within the Second Circuit. For instance, in *WorldCom,* 354 F. Supp. 2d at 471 (S.D.N.Y. 2005), the court—which presided over both the underlying federal securities law litigation and the coverage action—granted the insured's motion for a preliminary injunction and ordered the insurers to pay

14

his defense costs under a Directors and Officers policy much like the Policy at issue here. In holding that the insured director demonstrated irreparable injury, the court explained:

> It is impossible to predict or quantify the impact on a litigant of a failure to have adequate representation at this critical stage of litigation. The ability to mount a successful defense requires competent and diligent representation. The impact of an adverse judgment will have ramifications beyond the money that will necessarily be involved. There is the damage to reputation, the stress of litigation, and the risk of financial ruin — each of which is an intangible but very real burden.

*Id.* at 469.

Moreover, the *WorldCom* court rejected the insurer's contention that its insured had failed to show irreparable injury because he had not demonstrated that he could not afford to pay the defense costs himself:

> The issues here surmount whether an individual director has or does not have sufficient funds to pay counsel when confronted with litigation stemming from service as a corporate director. In some cases the litigation will be minor; here it is massive. In some cases a director will have great personal wealth; in other cases she will not. ***The issue here is whether every director protected by a policy*** equivalent to National Union's ***is entitled to ongoing payment of defense costs until there is a judicial determination that that right does not exist***. Under the terms of the National Union policy, and for the reasons set forth here, ***the answer is yes***.

*Id.* at 470 (emphasis added).

Likewise, in *XL Specialty*, the court entered an injunction awarding defense costs to an insured investment advisor and its directors, officers, and employees in connection with a federal criminal investigation, stressing the severity of the irreparable harm faced by insureds confronted with actual or threatened criminal charges when an insurer refuses to pay defense costs. *XL Specialty,* 874 F. Supp. 2d at 273-74 (internal citation omitted).

Here, in their ROR Letter, the Underwriters ***acknowledged*** their obligation to provide coverage to Mr. Napout, and the court in *Li* explicitly held that the Policy entitles insureds such

15

as Mr. Napout to payment of their legal costs "at the time they are incurred and on an ongoing basis." *Li*, 183 F. Supp. 3d at 362 (E.D.N.Y). Instead of adhering to their contractual obligations as already determined in two prior actions in this District, the Underwriters essentially thumbed their noses at the rulings in *Li* and *Rocha*. With Mr. Napout's trial days away, the stakes could not be higher and the risks Mr. Napout faces will be severe and irreparable if he is denied reimbursement of his legal costs and payment of his ongoing legal costs as they are incurred. *See Li*, 183 F. Supp. 3d at 361-62 (holding that if an insured is denied its right to reimbursement of criminal defense costs, the insured is "likely to suffer 'extreme or very serious damage,' the highest of the standards the Second Circuit uses to measure irreparable harm") (quoting *XL Specialty*, 874 F. Supp. 2d at 272).

Mr. Napout faces a complex, high-profile criminal case with an international scope—the same proceedings faced by the insureds in *Li* and *Rocha*. Mr. Napout's inability to obtain **immediate** payment of his costs in defending the Underlying Action is not a harm that can be remediated by a later award of damages from the Underwriters. *See Li*, 183 F. Supp. 3d at 361 ("'To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation,' and that the harm is 'actual and imminent, not remote or speculative.'" (quoting *Kamerling v. Massanari,* 295 F.3d 206, 212 (2d Cir. 2002)). Accordingly, the Underwriters' refusal to timely pay Mr. Napout's legal costs presents him with the threat of immediate and irreparable harm and underscores the need for immediate injunctive relief in his favor.

### B. Mr. Napout is Likely to Prevail on the Merits.

The Underwriters already acknowledged that Mr. Napout is entitled to defense costs under the Policy. *See* Tumialán Decl., ¶¶ 7, 9. Thus, the only question that could possibly

remain is whether the Underwriters have breached the Policy by failing to pay Mr. Napout's legal defense costs at the time they are incurred and on an ongoing basis. As the Underwriters are well aware, the court in *Li* explicitly answered that question in the affirmative:

> It is … clear that the Insurers have an obligation to pay [the insured's] legal costs ***at the time they are incurred and on an ongoing basis***. That the Policy mandates such contemporaneous payments is evident in section 3.1, which provides, "Should the question of any wrongful intent be at issue, cover shall be granted for the defence costs" but an insured person "found guilty of wrongful intent… will be obliged to reimburse the Insurer for all payments made on his or her behalf." Policy § 3.1 ***Clearly, there would be no need to reimburse the insurer if contemporaneous payments were not required under the Policy***.

*Li,* 183 F. Supp. 3d at 362 (emphasis added); *see also Fed. Ins. Co. v. Kozlowski,* 792 N.Y.S.2d 397, 403 (N.Y. App. Div. 2005) ("The contemporaneous payment of defense costs is required because [t]he only reasonable interpretation of the loss clause in the … D & O Policy is that the insurer's obligation to pay accrues when the insured incurs the obligation, not after it has paid a judgment.") (citations omitted). As such, there can be no dispute that Mr. Napout has established a likelihood of success on the merits.

### C. The Balance of Equities Decidedly Favors the Issuance of Injunctive Relief.

As detailed above, Mr. Napout (a) will suffer irreparable harm if an injunction is not issued and (b) is likely to prevail on the merits. As such, he is entitled to injunctive relief. *Li*, 183 F. Supp. 3d at 360 (quoting *Christian Louboutin S.A.*, 696 F.3d at 215) (quoting *UBS Fin. Servs., Inc.*, 660 F.3d at 648); *Rocha*, 2016 U.S. Dist. LEXIS 188176, at *8 (citations omitted).

However, even if this Court were to find that instead of showing a likelihood of success, Mr. Napout has only raised sufficiently serious questions going to the merits, he is still entitled to injunctive relief because the balance of hardships tips decidedly in his favor. As the court also held in *Li*, in finding that the balance of hardships favored the issuance of an injunction:

17

> If no injunction is issued, [the insured] will never receive the benefit of his bargain, likely be deprived of his chosen counsel at this critical time, and sustain a conviction he might otherwise have avoided, while the Insurers, in any event, are relieved of their obligation to advance funds pending a final resolution. If, on the other hand, an injunction is issued, the Insurers face only monetary loss which may be recouped as provided in the Policy.

*Li*, 183 F. Supp. 3d at 363-64; *Rocha*, 2016 U.S. Dist. LEXIS 188176, at *8 (holding that the balance of hardships tips "decidedly" in favor of the insured) (citing *XL Specialty*, 874 F.Supp.2d at 273, 276 (holding that the balance of hardships tipped "***not only decisively but lopsidedly***, in favor of the Insured") (emphasis added); *WorldCom*, 354 F. Supp. 2d at 463 n.10).

It unfortunately bears repeating that Mr. Napout is days away from trial and it is well settled that "[t]he ability to mount a successful defense requires competent and diligent representation." *WorldCom,* 354 F. Supp. 2d at 469. The requested injunction would direct the Underwriters to pay Mr. Napout's past legal costs, as well as his future legal costs at the time they are incurred and on an ongoing basis, even as the Underwriters reserve their rights. Because the balance of harms is decidedly—or, as *WorldCom* described it, "not only decisively but lopsidedly"—in favor of Mr. Napout, the Underwriters should be required to immediately pay his legal costs and to pay them on an ongoing basis as they are incurred.

### D. This Court Should Not Require Mr. Napout to Post a Bond

This Court should not require Mr. Napout to post a security bond in connection with this injunction because, as the *XL Specialty* court explained, "the posting of a security bond, and the attendant dislocations of doing so, would undermine the very protection that XL's professional liability policy offered to Insureds, particularly the individual Insureds, when they purchased the Policy." 874 F. Supp. 2d at 292; *see also WorldCom*, 354 F. Supp. 2d at 470.

## CONCLUSION

For the foregoing reasons, Mr. Napout respectfully requests that this Court grant his motion for a temporary restraining order and a preliminary injunction requiring the Underwriters to immediately pay Mr. Napout's legal costs in connection with the Underlying Action and to pay them on an ongoing basis as they are incurred, as required by the Policy.

Dated: November 2, 2017

Respectfully submitted,

*Juan Ángel Napout*

By: *s/*_____
One of His Attorneys

| | |
|---|---|
| HARRIS, ST. LAURENT & CHAUDHRY LLP<br>Andrew St. Laurent<br>Evan W. Bolla<br>Megan Dubatowka<br>40 Wall Street, 53rd Floor<br>New York, NY 10005<br>Tel: (646) 248-6010<br>andrew@sc-harris.com<br>ewbolla@sc-harris.com<br>mdubatowka@sc-harris.com | DYKEMA GOSSETT PLLC<br>Rosa M. Tumialán *(pro hac vice to be filed)*<br>Michael F. Derksen *(pro hac vice to be filed)*<br>10 S. Wacker Dr., Ste. 2300<br>Chicago, IL 60606<br>Tel.: (312) 876-1700<br>Fax: (312) 876-1155<br>rtumialan@dykema.com<br>mderksen@dykema.com |